UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHRISTIAN J. HENRICH,<br><br>                Plaintiff,<br><br>vs.<br><br>JOHN W. FIELD, individually,<br>JOSEPH B. ELAD, individually,<br>FAITH B. ELAD, individually,<br>QUANTUM LEAP HOLDINGS, INC.,<br>QUANTUM LEAP INNOVATIONS, INC.,<br><br>                Defendants. | **COMPLAINT**<br><br>**JURY IS DEMANDED**<br><br>Case No.:_____ |

Plaintiff, Christian J. Henrich ("Plaintiff"), by his attorneys, Damon & Morey LLP, as and for his Complaint against defendants above named, alleges, upon information and belief, as follows:

## **NATURE OF THE ACTION**

1. The nature of this action is for the recovery of monetary damages for wrongful termination of an employment agreement, breach of fiduciary duties to a shareholder, breach of contract, imposition of a constructive trust and accounting, conversion, and misrepresentation (innocent, negligent, and/or intentional), all arising from the wrongful conduct of the above named defendants.

2. The relief sought is direct and indirect damages of over one million dollars ($1,000,000.00), with interest thereon, plus exemplary damages where applicable.

## JURISDICTION AND VENUE

3.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1332.

4.  This Court has a basis for exercise of *in personam* jurisdiction over each defendant under New York Civil Procedure Law and Rules §§301 and 302.

5.  Venue is proper in this District under 28 U.S.C. §1391(a) as the events giving rise to the above-mentioned claims occurred in this District and the defendants are persons, corporations and/or legal entities subject to personal jurisdiction in this District due to their conducting business and/or directing business activities in this District. Thus, the defendants are considered residents of this District, and venue proper, in accordance with 28 U.S.C. §1391(c).

## THE PARTIES

6.  Plaintiff, an attorney, admitted to practice in the States of Delaware and New York, is the former employee of Quantum Leap Innovations, Inc. ("Innovations"), and currently resides in the Town of Orchard Park, County of Erie, State of New York.

7.  Defendant Innovations was and is, at all times herein mentioned, a corporation organized under the laws of the state of Delaware with its principal place of business at 3 Innovation Way, Suite 100, Newark, Delaware.

8.  Defendant Innovations was and is, at all times herein mentioned, engaged in the business of software programming and development.

9.  Defendant Quantum Leap Holdings, Inc. ("Holdings"), was and is, at all times herein mentioned, a corporation organized under the laws of the State of Delaware with its principal place of business at 3 Innovation Way, Suite 100, Newark, Delaware.

10. Defendant Holdings was and is, at all times herein mentioned, engaged in the business of holding stock in Innovations, Quantum Leap Life Sciences, Inc., Quantum Leap

Research Inc. ("Research"), Quantum Leap Interactive, Inc., Quantum Leap Solutions, Inc., Quantum Leap Technologies, Inc., and   (collectively referred to as "Quantum Entities").

11. Defendant John W. Field ("Field") was and is, at all times herein mentioned, an individual residing in the County of New Castle, State of Delaware.

12. Defendant Field was and is, at all material times herein mentioned, the Chairman of the Board of Directors of Holdings.

13. Defendant Field was and is, at all material times herein mentioned, a substantial shareholder of Holdings.

14. Defendant Joseph B. Elad ("JB Elad") was and is, at all times herein mentioned, an individual residing in the County of New Castle, State of Delaware.

15. Defendant JB Elad was and is, at all times herein mentioned, the Chief Executive Officer and/or President of Innovations.

16. Defendant JB Elad was and is, at all times herein mentioned, a member of the Board of Directors of the Quantum Entities.

17.  Defendant Faith B. Elad ("FB Elad") was and is, at all times herein mentioned, an individual residing in the County of New Castle, State of Delaware.

18. Defendant FB Elad was and is, at all material times herein mentioned, the majority shareholder of Holdings.

19. Defendant FB Elad was and is a member of the Board of Directors of the Quantum Entities.

20. Defendant FB Elad was and is, at all material times stated herein, President of Holdings and Secretary of Innovations.

21. For the sake of convenience, Defendants Innovations, Holdings, Fields, JB Elad, Fb Elad will be collectively referred to herein as the "Defendants".

## BACKGROUND FACTS
## COMMON TO ALL CAUSES OF ACTION

22. The Quantum Entities, collectively, was and are, at all times herein mentioned, engaged in the business of developing unique, intelligent software solutions for government, military, and manufacturing customers.

23. In October 2000, Defendants JB Elad and Field approached the Plaintiff to inquire whether the Plaintiff would be interested in joining the Quantum Entities as the head of business development.

24. In 1999, the Plaintiff obtained a Masters in Business Administration from the University of Pennsylvania's Wharton School of Business.

25. In 1999, the Plaintiff obtained a law degree from the University of Pennsylvania.

26. From November 1, 2000 to about August 27, 2001, Defendant JB Elad and the Plaintiff agreed that the Plaintiff would provide Quantum Entities with consultant services (referred to as the "Initial Services" period).

27. On behalf of the Quantum Entities, Defendant JB Elad and the Plaintiff agreed that the Plaintiff would receive deferred compensation during the Initial Services period.

28. During the Initial Services period, the Plaintiff, as a consultant, provided not less than five hundred twenty-five (525) hours of service to the Quantum Entities.

29. Defendant JB Elad repeatedly assured the Plaintiff that the Defendant JB Elad would "take care of [the Plaintiff], and treat [the Plaintiff] fairly for the services [the Plaintiff] was providing at the time" to the Quantum Entities despite the fact that the Quantum Entities were not financially viable.

30. During March and April 2001, the Quantum Entities had nearly no cash receipts.

31. In summer of 2000, Defendant Innovations bid for and was awarded a Phase II contract by the Air Force to develop a software program that (i) created the optimal schedule for downloading and uploading information from approximately 700 intelligence gathering satellites and (ii) scheduled launch and maintenance activities during the two week period prior to space shuttle launches (the "Air Force Project").

32. Each of the satellite and launch scheduling projects had been deemed "unsolvable" by the United States Air Force Space Command ("Space Command") and submitted to industry competition for solutions.

33. The Air Force Project started in May 2001.

34. The Air Force Project generated sufficient cash flow to cover approximately 80% of the Quantum Entities' expenses during the approximately 15 month performance period.

35. In late January of 2002, the Plaintiff undertook direct management of the Air Force Project.

36. After commencement of the Air Force Project and in order to cover the Quantum Entities' negative cash flow, Defendant Field agreed to provide a $250,000.00 certificate of deposit (the "Field Certificate of Deposit") as collateral to enable the Quantum Entities to secure a line of credit in the same amount from Christiana Bank (the "Christiana Line of Credit").

37. The Quantum Entities obtained the Christiana Line of Credit in August of 2001.

## THE EMPLOYMENT AGREEMENT

38. From about May 1, 2001 to about August 15, 2001, Defendant JB Elad and the Plaintiff negotiated the terms of the Plaintiff's employment with Defendant Innovations.

5

39. On August 27, 2001, Plaintiff and Defendant Innovations executed an Employment Agreement for an unspecified term as an at-will employee (the "Innovations Employment Agreement").

40. A true and correct copy of the Innovations Employment Agreement, **Marked Exhibit "A"**, is attached hereto and incorporated by reference.

41. Pursuant to the express terms of the Innovations Employment Agreement, Defendant Innovations employed the Plaintiff as the Chief Network Building Officer of Innovations.

42. In addition to a base salary, in paragraph 3(a)(ii) of the Innovations Employment Agreement, Defendant Innovations agreed to issue to the Plaintiff three thousand, two hundred and fifty (3,250) shares of "Granted Stock" of Innovations with the following restrictions:

> (a) the Corporation shall have right to repurchase, for one cent ($.01) per share, 100% of the Granted Stock up to November 1, 2001 (the "Initial Vesting Date").
>
> (b) After the Initial Vesting Date, the Corporation shall have the right to repurchase from the Employee, for one cent ($.01) per share, the number of shares equal to the number that results from the following formula (the "Unvested Shares"):
>
> $X$ = Total number of shares of the Granted Stock
> $Y$ = Number of calendar months that have been completed subsequent to October 31, 2001
>
> $[X * (.625)] - [Y * (.017361111) * X]$ = The Unvested Shares.

43. At the time Plaintiff was wrongfully terminated by the Defendants, the Plaintiff owned 1,896 shares of Innovations stock (the "Vested Shares").

44. The Plaintiff conditioned his execution of the Innovations Employment Agreement upon JB Elad's oral representation that (1) the Quantum Entities had no liabilities other than those set forth in their Balance Sheets and (2) Field's guarantee of a line of credit with Christiana Bank for not less than $250,000.00.

45. At the time Plaintiff executed the Innovations Employment Agreement, the Quantum Entities had a "pipeline" of approximately $550,000 of future work and expenditures exceeded revenues by approximately $25,000 per month.

46. On November 5, 2001 the Board of Directors of Holdings held a "special meeting" wherein the Board of Directors of Holdings ratified the issuance of three thousand, two hundred fifty (3,250) shares of restricted Common Stock of Holdings to the Plaintiff (the "Holdings Shares").

47. The Vested Shares and Holdings Shares will collectively be referred to as the "Plaintiff's Shares."

## THE PROMOTION

48. In February 2002, the Plaintiff was promoted to Chief Operating Officer of Innovations.

49. In February 2002, at or about the same time as the Plaintiff was named the Chief Operating Officer of Innovations, Defendant JB Elad appointed the Plaintiff project manager of the Air Force Project, which, at the time, was the Quantum Entities' largest software project and principal source of revenue.

50. As project manager of the Air Force Project, the Plaintiff was responsible for day-to-day management of the software development activities of approximately 10 software developers as well as coordinating testing and interaction with Space Command.

51. At the time the Plaintiff was appointed project manager of the Air Force Project, Defendant JB Elad instructed the Plaintiff to "milk" the Air Force Project for "cash."

52. At the time Plaintiff was appointed project manager of the Air Force Project, Defendant JB Elad also stated to the Plaintiff that Defendant JB Elad "expected nothing successful" from the Air Force Project.

53. After the Plaintiff undertook project manager responsibilities for the Air Force Project, it became successful and was awarded the prestigious Tibbets award, which the Quantum Entities marketed to obtain additional business from the United States government.

54. For three (3) successive months (April, May, and June of 2002), the Plaintiff agreed to accept one-half his normal monthly salary to help preserve the Quantum Entities' cash flow.

55. On August 19, 2002, the Plaintiff received a superlative employment review that stated, among other things, that the Quantum Entities were "lucky to have you" and praised the Plaintiff for "fix[ing]" the Air Force Project.

56. A true and correct copy of the employment review, Marked as **Exhibit "B"**, is attached hereto and incorporated by reference.

57. At or about the time of the superlative employment review, the Quantum Entities rewarded the Plaintiff with a $250,000 life insurance policy.

## THE BUDNER PROMISSORY NOTE

58. On or about Fall of 1998, Innovations entered into a promissory note whereby Mr. Stanley Budner, father-in-law to Defendant JB Elad, agreed to loan Innovations approximately $350,000.00 (the "Budner Liability") (collectively referred to as the "Budner-Innovations Loan Documents").

59. At the time, Defendant JB Elad and FB Elad were the sole shareholders of Defendant Innovations.

60. The Defendants never disclosed to the Plaintiff the Budner Liability before execution of the Innovations Employment Agreement.

61. On July 26, 2002, the Board of Directors of Holdings resolved that in the event the Quantum Entities experienced a liquidity event of not less than $50,000,000.00, the Quantum Entities would pay Defendant JB Elad $500,000.00 for the purpose of satisfying the Budner Liability relating to the Budner-Innovations Loan Documents (the "Budner Resolution").

62. On or about August 15, 2002, Defendant Field agreed to allow Christiana Bank ("Christiana") to receive the proceeds from the Field Certificate of Deposit that had been guaranteeing the Christiana Line of Credit in exchange for six thousand thirty (6,030) shares of Holdings.

63. The Field Certificate of Deposit significantly reduced the Quantum Entities' financial obligations.

64. In August 2002, as compensation for the Field Certificate of Deposit, the Board of Directors of Holdings issued six thousand thirty (6,030) shares of Holdings at a per share price of approximately forty-one dollars and fifty cents ($41.50) per share as payment for the Field Certificate of Deposit.

65. During late August 2002, the Plaintiff discovered another set of loan documents establishing that a Quantum corporation wholly owned by Defendant JB Elad was solely liable for repaying the Budner Liability (the "Fake Budner Loan Documents.")

66. When the Plaintiff confronted Defendant JB Elad about two sets of loan documents, in late August 2002, Defendant JB Elad told the Plaintiff that the Budner Liability was his personal obligation only and not Defendant Innovations' liability.

67. In late August 2002, Defendant JB Elad instructed the Plaintiff to destroy the Budner Loan Documents obligating Holdings and/or Innovations to pay the Budner Liability.

68. The Plaintiff refused to destroy either the Budner Loan Documents or the Fake Budner Loan Documents.

69. Upon such refusal, Defendant JB Elad became extremely angry and stopped all verbal communication with the Plaintiff for several weeks.

## THE ANALYSIS

70. At approximately the same time as Defendant JB Elad demanded that the Plaintiff destroy the Budner Loan Documents, Defendant Field instructed the Plaintiff to provide an analysis of how to reduce the Quantum Entities' expenditures and to identify all financial practices that would need to be altered to comply with demands of potential investors and/or auditors (the "Analysis").

71. The Analysis set forth a number of recommended changes, including, among other matters, the following recommendations:

   (a) that the Quantum Entities cease paying Defendants JB Elad and FB Elad's handyman's salary as the handyman performed few or no services for the Quantum Entities;

   (b) reducing the monthly royalty payments to Research as excessive and unlikely to survive auditor scrutiny;

   (c) increase JB Elad's salary;

   (d) reduction of Defendant FB Elad's salary; and

   (e) introduction of a cost accounting system.

72. In early September 2002, the Quantum Entities received official notice that it had been awarded a six million dollar project from the Office of Naval Research (the "Homeland Security Project").

73. In August 2002, the Quantum Entities began an extensive hiring process, ultimately making permanent hires of approximately five (5) persons to commence work on the Homeland Security Project.

74. During October 2002, the Quantum Entities received the Tibbetts Award from the Small Business Administration for the company's performance on the Air Force Project.

75. The Tibbetts Award is given annually to approximately sixty (60) companies from a pool of two thousand, five hundred (2,500) companies for superlative performance on Phase II of the Small Business Innovation Research program.

76. On or about November 5, 2002, the Plaintiff gave a well-received and successful brief to a collection of senior members of Space Command, including Lieutenant General Brian A. Arnold, regarding the Air Force Project.

**WRONGFUL TERMINATION**

77. On or about November 8, 2002, Defendant Field informed the Plaintiff that he was terminated, effective immediately.

78. Defendant Field also assured the Plaintiff that "he would be treated fairly" and his shares, if repurchased, would be repurchased "for a fair price."

79. Shortly after being terminated, the Plaintiff permanently moved his residence to New York.

80. Upon information and belief, the Board of Directors of Innovations never met, as required by Section 8 of the Innovations Employment Agreement, to discuss termination of the Plaintiff.

81. On November 18, 2002, after the Plaintiff moved to New York, Innovations sent the Plaintiff a corporate check in the amount of $13.54 to cover the repurchase of the Unvested Shares based upon the formula contained in paragraph 3(a)(ii) of the Innovations Employment Agreement.

82. In early February 2003, the Plaintiff received a letter dated January 31, 2003 in the amount of $530.88 purporting to repurchase the Vested Shares for twenty-eight cents ($.28) per share.

83. On or about February 18, 2003, the Plaintiff advised Defendants that the Plaintiff was rejecting the Defendants' offer to repurchase the vested shares as patently unfair and that the price was not establish pursuant to the express terms of the Innovations Employment Agreement.

84. On March 13, 2003, Defendant JB Elad purportedly reaffirmed that the "fair market value <u>as established by the Board of Directors</u> was $.28/share."

85. Upon information and belief, the Board never met to discuss the fair market value of Plaintiff's Vested Shares.

86. On June 2, 2003, the Plaintiff sent a correspondence via facsimile to Defendant Field, Mike Bowman, and Defendant JB Elad stating that the "offer to purchase [the Plaintiff's] shares of stock is completely unacceptable."

87. Neither, Defendant Field, Defendant JB Elad, nor any other representative of the Quantum Entities responded to the June 2, 2003 facsimile correspondence.

### FIRST CAUSE OF ACTION
### Unlawful Termination

88. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 87, inclusive, and incorporates them herein by reference.

89. The State of Delaware has a substantial interest in officers and agents of a corporation preserving corporate records.

90. Plaintiff was the Chief Operating Officer of Innovations and therefore responsible for all operations of the corporation, creation of corporate records, and legal matters.

91. Defendant JB Elad instructed the Plaintiff to destroy corporate records to eliminate evidence of a substantial corporate liability.

92. Destruction of such documents would have been a breach of the Plaintiff's fiduciary duty to Defendant Innovations and/or the Quantum Entities and unlawful.

93. Upon information and belief, the Plaintiff was terminated for his refusal to destroy such documents.

94. As a result of the Defendants' wrongful actions, the Plaintiff is entitled to recover damages based on his loss due to such breach in an amount to be proven at trial but not less than $100,000.00.

### SECOND CAUSE OF ACTION
### Unlawful Termination:  Misrepresentation

95. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 94, inclusive, and incorporates them herein by reference

96. Plaintiff executed the Innovations Employment Agreement on the express condition that the Quantum Entities disclosed all corporate liabilities.

97. Defendant JB Elad intentionally misrepresented the extent of the debt obligations of the Quantum Entities in that he knowingly and purposefully concealed from the Plaintiff the existence of the Budner Liability in that prior to the Plaintiff becoming an employee of Innovations Defendant JB Elad stated to the Plaintiff that (a) the Quantum Entities had no further liabilities beyond those disclosed on the Quantum Entities' balance sheet and concealed the fact that the Quantum Entities, not Defendant JB Elad, was obligated to repay the Budner Liability.

98. Plaintiff left Morris, Nichols, Arsht & Tunnel to join the Quantum Entities based, in part, upon Defendant JB Elad's misrepresentation.

99. As a result of the Defendants' wrongful actions, the Plaintiff is entitled to recover damages based on his loss due to such breach in an amount to be proven at trial but not less than $100,000.00.

### THIRD CAUSE OF ACTION
### Breach of Contract

100. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 99, inclusive, and incorporates them herein by reference

101. In executing the Innovations Employment Agreement, Innovations agreed to pay a fair market value for the Vested Shares.

102. The Defendants have refused to honor the terms of the Innovations Employment Agreement in that they have failed to pay the Plaintiff a fair market value for the Vested Shares.

103. Based upon the default in performance and resulting breach of the Innovations Employment Agreement by the Defendants, the Plaintiff is entitled to recover damages based on his loss due to such breach in an amount to be proven at trial but not less than $100,000.00.

## FOURTH CAUSE OF ACTION
### Conversion

104.  Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 103, inclusive, and incorporates them herein by reference.

105.  The Plaintiff is the rightful owner of the Vested Shares.

106.  The Defendants have converted for their own personal use and benefit the Vested Shares.

107.  The Defendants' conversion of the Vested Shares has resulted in the deprivation of the use, enjoyment and benefit of the Vested Shares to the Plaintiff.

108.  The Plaintiff has demanded that the Defendants repurchase the Vested Shares at a fair market value.

109.  The Defendants have intentionally and maliciously refused to repurchase the Vested Shares at a fair market value.

110.  As a direct and proximate result of the Defendants' wrongful conversion of the Vested Shares, the Plaintiff is entitled to recover damages based on his loss due to such breach in an amount to be proven at trial but not less than $100,000.00.

111.  Additionally, by reason of the willful and malicious nature of the conversion, the Plaintiff is entitled to recover punitive damages in the amount of $300,000.00.

## FIFTH CAUSE OF ACTION
### Declaratory Action

112.  Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 111, inclusive, and incorporates them herein by reference.

113.  The Plaintiff seeks judgment as to Plaintiff's rights and ownership to the Vested Shares.

114. Plaintiff seeks judgment that Defendants have not lawfully exercised its right to repurchase the Vested Shares.

115. The Plaintiff seeks judgment as to Plaintiff's rights and ownership to the Holdings Shares.

116. The Plaintiff has received no communication (such as a notice to stockholders) from any of the Defendants or the Quantum Entities in over two years even though, upon information and belief, Holdings has reorganized its capital structure during that period of time.

117. A case and controversy exists between the parties as the Defendants have refused to repurchase the Vested Shares at a fair market value as required by the express terms of the Innovations Employment Agreement.

118. Plaintiff has no adequate remedy at law.

119. Plaintiff seeks a speedy hearing in respect to Plaintiff's prayer for relief regarding Plaintiff's rights and ownership in the Plaintiff's Shares.

## SIXTH CAUSE OF ACTION
### Breach of Fiduciary Duties

120. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 119, inclusive, and incorporates them herein by reference.

121. The wrongful conduct of Defendants JB Elad, FB Faith and Field ("Individual Defendants") constitutes a breach or breaches of fiduciary duties owed by them to the Plaintiff, as a stockholder of Innovations and/or constitutes gross mismanagement on the part of the Individual Defendants.

122. The wrongful conduct of Individual Defendants constitutes a breach or breaches of fiduciary duties owed by them to the Plaintiff, as a minority stockholder of Holdings and/or constitutes gross mismanagement on the part of the Individual Defendants.

123.  As a direct and proximate result of the wrongful conduct of the Individual Defendants has been deprived of money and property, the full extent of which is not known.

124.  By reason of the foregoing, the Plaintiff has been damaged in the amount to be proven at trial, but in no event less than $1,000,000.00.

125.  The wrongful conduct of the Individual Defendants was gross, wanton, willful, malicious and deliberately designed to injure the Plaintiff, thereby entitling the Plaintiff to punitive damages of not less than $2,000,000.00.

### SEVENTH CAUSE OF ACTION
### Constructive Trust to Prevent Unjust Enrichment

126.  Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 125 inclusive, and incorporates them herein by reference

127.  By virtue of the Defendants' scheme and artifice to wrong the Plaintiff, the Defendant now unfairly and unjustly holds the Vested Shares.

128.  In purporting to acquire the Vested Shares under the circumstances set forth herein, the Defendants' wrongful activities are such that the Defendants may not in good conscience be allowed to retain the Vested Shares.

129.  Any further benefit to the Defendants based upon the use and enjoyment of the wrongful conversion of the Vested Shares will only result in further unjust enrichment to the Defendants.

130.  Based upon these facts and the nature of the Defendants' actions, the Court should impose a constructive trust upon the Vested Shares in favor of the Plaintiff, and declare the Defendants trustees over the Vested Shares until such time as this Court appoints an independent trustee.

131. As trustee of the constructive trust, the Defendants should be made to account for the fair market value of the Vested Shares in Defendants' possession and control up to and through the time that this Court appoints an independent trustee and the Vested Shares are delivered to the trustee.

**WHEREFORE**, Plaintiffs demand judgment against the defendants as follows:

a. On the **FIRST** and **SECOND CAUSES OF ACTION**, that Defendants wrongfully terminated the Plaintiff causing the Plaintiff damage in the amount to be proven at trial, but in no event less than $100,000.00;

b. On the **THIRD CAUSE OF ACTION**, that Defendants breach the Innovations Employment Agreement causing the Plaintiff damage in the amount to be proven at trial, but in no event less than $100,000.00;

c. On the **FOURTH CAUSE OF ACTION**, that Defendants have wrongfully converted the Plaintiff's Shares causing the Plaintiff damage in the amount to be proven at trial, but in no event less than $100,000.00; together with punitive damages in the amount of $300,000.00;

d. On the **FIFTH CAUSE OF ACTION**, that judgment be entered declaring that the Plaintiff retains rights and ownership in the Vested Shares and Holdings Shares;

e. On the **SIXTH CAUSE OF ACTION**, that the Individual Defendants, jointly and severally, have breached certain fiduciary duties to the Plaintiff causing the Plaintiff damage in the amount to be proven at trial, but in no event less than $1,000,000.00; together with punitive damages in the amount of $2,000,000.00.

    f.    On the **SEVENTH CAUSE OF ACTION**, that a constructive trust be imposed on the Defendants over the Vested Shares; and

    g.    Against all Defendants, on all causes of action, for costs, disbursements, pre-judgment interest and post-judgment interest and such other and further relief as may be just, proper and equitable.

DATED:   Buffalo, New York
         November 4, 2005

                                      **DAMON & MOREY LLP**

                                      By:  /s/ David S. Widenor
                                            David S. Widenor, Esq.
                                    1000 Cathedral Place
                                    298 Main Street
                                    Buffalo, New York 14202
                                    (716) 856-5500

954888 v2